UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

WILLIE DIXON

v.                                            Civil Action No. CCB-14-2473

WEXFORD HEALTH SOURCES

## MEMORANDUM

This matter is before the court on Willie Dixon's ("Dixon") complaint for injunctive relief and damages, ECF No. 1; Dixon's motions for preliminary and emergency injunctions, ECF Nos. 27 & 30; a second "renewed" motion for summary judgment and an opposition to the motions for preliminary and emergency injunctions filed by Wexford Health Sources ("Wexford"), ECF No. 31; Dixon's opposition response, ECF No. 35; Wexford's reply, ECF No. 36; and Wexford's supplement to its renewed motion, ECF No. 39, to which Dixon has filed a reply, ECF No. 42.  For the reasons outlined below, emergency injunctive relief will be denied and the defendant's motion for summary judgment will be granted.[1]

## BACKGROUND

---

[1] This case has been transferred to the undersigned because of a temporary imbalance in workload.

Dixon, a self-represented Maryland inmate, filed a complaint in August 2014 for injunctive relief and unspecified damages alleging the following:   On November 5, 2013, he was taken to the University of Maryland Hospital's ("UMH") emergency room for treatment to his left eye related to uveitis.   The UMH physician recommended that Dixon see a rheumatologist and return in two weeks. Compl. at p. 3.   Dixon claims that Wexford failed to make the appointments.   Dixon further states that on April 29, 2014, he went to Keran [sic] Hospital[2] for an inflammation examination by a rheumatologist, who recommended that an x-ray and bloodwork be conducted; Dixon be seen by a UMH uveitis specialist within two weeks; and Dixon return to see the rheumatologist in four weeks.   *Id.* at p. 4.   Dixon states that these appointments were not made.

Dixon further claims he went to the Cumberland Valley Retina Consultants ("CVRC") on May 20, 2014, to get steroidal injections in his right eye.[3]   There, he was informed by Dr. Hu that he had developed cataracts in his left eye from the steroid injections.   He alleges that Dr. Hu prescribed him an oral medication that was later denied by the "Medical Director."   Dixon asserts that he was not seen by

---

[2]   It is believed that Dixon is referring to the University of Maryland Rehabilitation & Orthopaedic Institute, located on Kernan Drive in Baltimore, Maryland.   It was previously known as Kernan Hospital.
[3]   Dixon indicates that, in April of 2014, the "Kernan Hospital" rheumatologist told him to stop getting the steroid injections because the uveitis specialist would prescribe oral medication or chemotherapy injections to combat the disease.   Compl. at p. 4.

a physician or physician's assistant ("PA"), and none of the rheumatologist's recommendations were discussed. *Id.* at p. 5. He asserts that he has developed additional eye problems, including partial loss of sight, severe headaches, eye pain, and cataracts.[4] *Id.*

Dixon's correspondence to the court in September 2014 stated that he was experiencing eye swelling and Dr. Hu had sent a facsimile to Wexford for Dixon to see a uveitis specialist at UMH to obtain inflammation suppressants. ECF No. 6. He later indicated that, in October of 2014, he was taken to Johns Hopkins Hospital's Wilmer Eye Clinic ("Wilmer"), but they had no records and were not aware of why he was there. ECF No. 10. He claimed that he was to return to Wilmer in December of 2014. *Id.* In another letter, Dixon notes that he was informed that he would not have cataract surgery until after he saw a rheumatologist. ECF No. 13. He additionally claims he was seen by a Wilmer uveitis specialist on December 11, 2014, and x-rays or scans revealed swelling in both eyes. ECF No. 14. Dixon states he was given steroid injections in both eyes, but his lab work and x-rays were not released to the specialist. *Id.* Finally, Dixon alleges that he saw the "Kernan Hospital" rheumatologist in December of 2014,

---

[4] Attached to the complaint are Dixon's administrative remedy procedure grievances, inmate requests, and the notes of a consultant and Wexford personnel concerning Dixon's appointments and care. Compl. Exs., ECF Nos. 1-1, 1-2, 1-3, 1-4, 1-5 & 1-6.

3

but it was only to sign a consent form.  He complains that Wexford is drawing out and delaying his treatment.  ECF No. 15.

On January 15, 2015, Wexford filed a motion to dismiss or for summary judgment accompanied by a memorandum, medical records, and the affidavit of Dr. Colin Ottey, Wexford's Medical Director of the Department of Public Safety and Correctional Services ("DPSCS") for the Western Maryland prison system. ECF No. 16.  On July 1, 2015, the motion was dismissed as moot in light of Dixon's additional allegations, and Wexford was directed to respond to the amended claims.  ECF No. 26.

On July 15, 2015, Dixon filed a motion for a preliminary injunction pursuant to Fed. R. Civ. P. 65.  ECF No. 27.  He claimed that, following his diagnosis of Behcet's disease, physicians at Wilmer ordered him to receive a particular medication, CellCept.[5]  Dixon complains that the medication was changed to the "less effective and less costly medication" of Humira, which has caused him physical side effects.  He seeks injunctive relief "as to why [Wexford] will not provide [him] with the medication that was ordered by the Wilmer Eye Clinic at [JHH] that would have been more effective in treating my condition."[6]  *Id.*  He subsequently filed a second motion for a preliminary injunction alleging that

---

[5]    CellCept    is    an    immunosuppressant.    *See*    CellCept,    Drugs.com, http://www.drugs.com/cellcept.html (last updated Aug. 8, 2015).

[6] These allegations also were raised in additional letters filed by Dixon.  ECF Nos. 23 & 24.

Humira was "destroying him" and again asked to be placed on CellCept.  ECF No. 30.  On July 28, 2015, the court directed Wexford to respond to Dixon's amended allegations and request for emergency relief.  ECF No. 29.  On August 13, 2015, Wexford filed its second motion for summary judgment and opposition to the motions for an injunction.  ECF No. 31.  Dixon has responded.  ECF No. 35.  The issues now before the court concern whether Dixon has been denied necessary medical care for his conditions and whether he is entitled to emergency injunctive relief.

## LEGAL STANDARDS

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  In analyzing a summary

judgment motion, the court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).   Because Dixon is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  But, the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

With regard to the claims raised against Wexford, the Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).   "Scrutiny under the Eighth Amendment is not limited to those

punishments authorized by statute and imposed by a criminal judgment."
*De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*,
501 U.S. 294, 297 (1991)).   In order to state an Eighth Amendment claim for
denial of medical care, a plaintiff must demonstrate that the acts or omissions of
the defendants amounted to deliberate indifference to his serious medical needs.
*See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Iko v. Shreve*, 535 F.3d
225, 241 (4th Cir. 2008).

A deliberate indifference claim consists of two components, objective and
subjective.   *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).   Objectively,
the inmate's medical condition must be "serious," or "one that has been diagnosed
by a physician as mandating treatment or one that is so obvious that even a lay
person would easily recognize the necessity for a doctor's attention." *Id.* (quoting
*Iko*, 535 F.3d at 241).   Wexford does not deny that Dixon's condition is serious.
Subjectively, "[a]n official is deliberately indifferent to an inmate's serious
medical needs only when he or she subjectively 'knows of and disregards an
excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer v. Brennan*, 511
U.S. 825, 837 (1994)).   "[I]t is not enough that an official *should* have known of a
risk; he or she must have had actual subjective knowledge of both the inmate's

serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (emphasis in original).

Inmates do not have a constitutional right to the treatment of their choice, *see Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986), and disagreements between medical staff and an inmate over the inmate's proper care do not rise to the level of a constitutional injury absent exceptional circumstances, *see Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).[7]

Dixon asks this court to issue a preliminary injunction against Wexford. Under the law in this circuit, the party seeking a preliminary injunction must demonstrate that: (1) he is likely to succeed on the merits at trial; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)), *vacated on other grounds*, 558 U.S. 1089 (2010).

## DISCUSSION

---

[7] Although not argued as a defense by Wexford, Dixon's claims may not be raised against Wexford as a corporate entity because it cannot be held liable under 42 U.S.C. § 1983. Principles of municipal liability under § 1983 apply equally to a private corporation. Therefore, a private corporation is not liable under § 1983 for actions committed by its employees when such liability is predicated solely upon a theory of *respondeat superior*. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999). Nonetheless, the court will examine the merits of Dixon's Eighth Amendment claim by reviewing the record and affidavits submitted.

In its renewed motion for summary judgment and its opposition to Dixon's injunction motions, Wexford adopts and incorporates in its entirety its original dispositive motion. The record indicates that Dixon is a 49-year-old male with a medical history significant for chronic idiopathic bilateral posterior uveitis with panuveitis with cystoid macula edema and subcapsular cataract development.[8] Because the underlying cause of uveitis can include a broad spectrum of disorders, including autoimmune disease, infections, rheumatological disorders, and malignant diseases of the eye, Wexford argues that the management of patients with uveitis involves a multidisciplinary approach across specialties including, but not limited to, regular evaluations by the patient's primary care providers, visits to ophthalmology specialists, and consultations with rheumatology, infectious disease, or other specialists if necessary. ECF No. 31-3.[9]

Dixon's uveitis condition first presented itself in November of 2012, with a sudden decrease in visual acuity. Dixon was evaluated by the on-site ophthalmologist, Dr. Amy Green-Simms, who requested imaging studies of the orbits. On December 12, 2012, a consult request was presented for Dixon's referral to CVRC. ECF No. 16-3.

---

[8] Uveitis involves inflammation of eye tissue. These terms are more fully described in Wexford's motion and affidavit. *See* ECF Nos. 16-3, 31-3.

[9] All references to exhibits are made to the assigned electronic pagination.

Dixon began treatment by retina specialists at CVRC on January 4, 2013, and was seen by specialists throughout 2013 and 2014. He started receiving therapeutic Kenalog steroid injections in his eyes. *Id.*

On April 29, 2014, Dixon was seen at UMH by rheumatologist Dr. Jamal Mikdashi. The physician identified Behcet's disease[10] as the most likely cause of Dixon's uveitis. To treat the disorder, Dr. Mikdashi recommended considering Humira or CellCept as immunosuppessive therapy. *Id.*; ECF No. 16-2 at pp. 117, 253-256.

On October 7, 2014, Dixon was seen at Wilmer by Dr. Charles Castoro for evaluation of intermediate panuveitis of both eyes. ECF No. 16-2 at pp. 243-246. Castoro's recommendations included returning to the uveitis eye clinic in two months to determine whether or not to start immunomodulatory therapy. *Id.* On October 31, 2014, Dr. Green-Simms evaluated Dixon, who reported flashes in the right eye with improvement of pain and photosensitivity. *Id.* at p. 195. It was recommended that Dixon continue all current treatment with topical eye drops and that he be followed by Dr. Green-Simms as well as uveitis and rheumatology specialists. Cataract surgery was not recommended at that time. *Id.*

---

[10] Behcet's disease is a rare disorder that causes inflammation in blood vessels throughout the body. *See* Behcet's Disease, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/behcets-disease/basics/definition/con-20027549 (last updated Feb. 5, 2016).

On December 11, 2014, Dixon returned to Wilmer and was seen by Dr. Theresa Leung.  Steroid injections were administered in both eyes and Dr. Leung recommended starting immunosuppressant therapy with CellCept.  *Id.* at pp. 246.1 & 246.4.

On December 23, 2014, Dixon was seen at UMH by Dr. Mikdashi, whose impression was that Dixon had panuveitis with mild disease activity.  *Id.* at pp. 259-261.  He again concluded that the most likely cause of Dixon's condition was Behcet's disease.  He determined that Dixon was a candidate for CellCept, but that he should be seen by ophthalmology to assess the need for immunosuppressive therapy.  ECF No. 16-3.  Wexford asserts that off-site specialists agreed that Dixon's cataract surgery should not be considered until his ocular inflammation was controlled.  ECF No. 31-3.

In January of 2015, Dixon's on-site physicians, in consultation with a trained clinical pharmacist, Dr. Naa Odifie, ordered that Dixon commence a trial of Humira.  *Id.*  After review of several studies, Dr. Odifie determined that Humira would be the most appropriate therapy to effectively treat Dixon and to achieve therapy goals.  *Id.*  Wexford observes that Humira is known as an anti-tumor necrosis factor ("TNF") drug, and that TNF agents have proven effective in reducing inflammation and slowing disease progression in the treatment of

Behcet's disease.  Wexford also notes that Humira is significantly more expensive than CellCept.  *Id.*

Dixon began to receive Humira injections every two weeks, beginning on January 21, 2015.  ECF No. 32-2 at pp. 12-13 & 16.  On February 20, 2015, Dixon was seen by the on-site ophthalmologist, Dr. Green-Simms, who noted that he had begun Humira therapy.  On examination, Dixon's visual acuity without correction was 20/400 in the left eye and 20/200 in the right eye.  His external, conjunctiva, and corneas were normal, although he was positive for cataracts in both eyes and capsule pigmentation in the anterior of the right eye.   Dr. Green-Simms' impression was that of bilateral panuevitis and bilateral cataracts.   She recommended adding Trusopt[11] twice a day to both eyes to decrease intraocular pressure and that Dixon continue on his other topical steroid eye drops.  *Id.* at p. 111.  On March 27, 2015, Dr. Green-Simms evaluated Dixon, who reported flashes on occasion with photosensitivity.  Dr. Green-Simms attributed the symptoms to Dixon's cataracts, which had not changed since his earlier evaluation.   Her impression was bilateral panuevitis with increasing ocular pressure; she ordered adjustments to Dixon's ocular eye drop regimen and that he return for reevaluation. *Id.* at p. 112.  On April 10, 2015, Dixon was reevaluated by Dr. Green-Simms for

---

[11] Trusopt (dorzolamide) is an ophthalmic solution (a liquid that is placed in the eyes) that is used for treating glaucoma.   *See* Dorzolamide, Trusopt, MedicineNet.com, http://www.medicinenet.com/dorzolamide/article.htm (last updated Dec. 22, 2015).

his reported worsening vision.  No changes to Dixon's visual acuity were noted. Dr. Green-Simms, however, observed that Dixon's cataracts involved the nuclear and back parts of the lens.  *Id.* at p. 113.  Her impression was bilateral panuevitis with still increasing ocular pressure and bilateral cataracts.  Five days later, Dixon was seen for a "throbbing" frontal headache.  It was noted that his left eye was red and he had elevated blood pressure.  A verbal order for Clonidine and Ibuprofen was given and the medication was administered.  Upon reevaluation after several hours, Dixon reported that his headache had subsided.  His visual acuity exam revealed a corrected vision of 20/50 in the left eye and 20/20 in the right eye.  ECF No. 31-3.

On June 29, 2015, Dixon was seen by on-site ophthalmologist, Dr. Michael Summerfield, for complaints of painless, worsening right-eye vision.  *Id.*  On examination, Dixon had uncorrected visual acuity of counting fingers in the right eye and 20/400 in the left eye.  *Id.*  The external, adnexa, conjunctiva, iris, and anterior chambers of his eyes were normal.  *Id.*  Dr. Summerfield noted dense 4+ cataracts in each eye and he attributed Dixon's hazy vision to his dense cataracts, particularly in his right eye.  *Id.*  He recommended that Dixon consider cataract surgery on the right eye to improve his vision, although significant risks would be involved, including increased retinal swelling and intraocular pressure.  *Id.*  He

further recommended continued interim use of Dixon's prescribed topical steroids, and a consult request was placed on Dixon's behalf for approval of cataract surgery to his right eye. *Id.*; *see also* ECF No. 32-2 at p. 114.

Wexford argues that, since commencing his Humira treatment, Dixon's only clinically documented complication was the development of prostatitis in June of 2015. His Humira treatment was suspended while he was treated with a course of antibiotics for this condition. ECF No. 31-3. According to Wexford, Dixon's prostatitis complaints were promptly resolved and there has been improvement in the inflammation of his eyes. Wexford asserts that Dixon himself reported that when off the Humira, his vision was worse. *Id.*; ECF No. 32-2 at p. 115.

On July 17, 2015, Dixon was again seen by Dr. Green-Simms, who found no substantive change to his eye condition with the exception of an abnormal iris and lens. ECF No. 31-3. The iris showed elevated fibrosis at the pupillary margin and Green-Simms noted hazy and dense cataracts in both eyes. *Id.* She assessed Dixon as positive for retinitis/vasculitis, attributed his decreased vision in the right eye to the cataract, and again discussed the risks associated with the surgery. *Id.*

On July 22, 2015, Dixon's ophthalmology and rheumatology consult requests were approved. *Id.* That same day, however, he refused to sign requested authorizations and releases for disclosure of his health records to Wilmer and

14

UMH.  *Id.*  Wexford maintains that, commencing July 24, 2015, Dixon began to refuse his Humira treatments because he believed it was causing gastrointestinal and chest discomfort, along with palpitations.  *Id.*  According to Wexford, Dixon was scheduled for elective cataract extraction surgery on the right eye in mid-September of 2015 at Bon Secours Hospital.  *Id.*  Indeed, the record shows that, on or about September 16, 2015, the surgery was performed.  ECF No. 40 at pp. 1-10. Wexford indicates that Dixon's Humira regimen continued through to December of 2015, and he has received follow-up ophthalmology and rheumatology appointments.  *Id.* at pp. 11-15, 19, 27-29, 32 & 40-46.

In his reply, Dixon acknowledges receiving the cataract surgery in September of 2015, but complains that, although he was to return for cataract surgery of his other (left) eye in three to six weeks, it has not occurred.  ECF No. 42.  He further asserts that the Humira treatment is causing him "severe abdominal pain to the lower right side and sharp pain under the back side of my genital and wasn't the drug presc[r]ibed by [an] outside physician or specialist."  *Id.*  Dixon claims that, while seen by medical staff for the pain, he was not examined and neither he nor a Keran [sic] physician were provided the results of a urinalysis

test.[12]   Finally, he continues to take issue with the medical staff's decision to prescribe him the "drug of their choice," Humira, rather than the CellCept medication prescribed in 2014.  *Id.*

There is no dispute that Dixon suffers from uveitis, which specialists suggest is caused by Behcet's disease.  He has been placed on a Humira injection regimen, once every two weeks, with positive results.  Dixon has been seen by on-site prison physicians, mid-level providers, ophthalmologists, and optometrists.  He has been regularly referred to off-site specialists at UMH, Wilmer, and local off-site consultants for rheumatology and ophthalmology appointments, and has received evaluations, steroid injections, eye drops to reduce inflammation, and cataract surgery to remove the cataract in his right eye.  In addition, Dixon has been seen by a number of nurses, physician's assistants, and on-site physicians.  While he may be dissatisfied with the course of treatment and the medication provided to him, the care he received, given his established eye conditions and underlying inflammatory disease, does not establish deliberate indifference on the part of Wexford.  No Eighth Amendment violation has been demonstrated.

---

[12] On March 9, 2016, Dixon filed a motion for miscellaneous relief seeking a court order to have Wexford release the results of his 2013 CAT scan of "his head and full body" taken at Bon Secours Hospital.  ECF No. 44 at p. 1.  He contends that at no time has he been provided the results, nor has a doctor or technician explained the results to him.  *Id.*  The motion shall be denied.

Dixon asks this court to issue a preliminary injunction against Wexford.  He has, however, failed to show that he will succeed on the merits of his case and that he will be subject to immediate and irreparable harm if emergency relief is not granted.  There is no demonstration of deliberate indifference on the part of Wexford.  Injunctive relief is not warranted and the motions shall be denied.

## CONCLUSION

The court finds no genuine issues of material fact meriting further proceedings.  For reasons set forth above, Wexford's motion for summary judgment will be granted and Dixon's motions for injunctive relief will be denied. A separate Order follows.

Date:  March 17, 2016                                   /s/
                                        Catherine C. Blake
                                        United States District Judge